**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. <u>24-60061-CR-LEIBOWITZ/AUGUSTIN-BIRCH</u>**

**UNITED STATES OF AMERICA**

**v.**

**KELVIN OWUSU NKWANTABISA, et al.**
_____/

**<u>GOVERNMENT'S TRIAL BRIEF AND OMNIBUS MOTION</u>**

The United States of America, by and through undersigned counsel, respectfully submits this Trial Brief and Omnibus Motion as an aid to the Court to expedite the resolution of certain evidentiary matters should they arise at trial. The Trial Brief will provide background concerning the individuals and entities relevant to this matter and summarize the charges and evidence the Government's intends to introduce at trial. The Omnibus Motion seeks to admit prior bad acts under Rule 404(b) of the Federal Rules of Evidence, introduce uncharged conduct as inextricably intertwined evidence, and exclude legal arguments that are irrelevant.

## I.   TRIAL BRIEF

### A.  <u>Background</u>

#### 1.  <u>The TCO</u>

From at least August 2022, a transnational criminal organization ("TCO") engaged in a complex business email compromise ("BEC") scheme, which is a type of cybercrime that involves a bad actor who uses email to trick a victim into sending money or divulging confidential information. In this case, members of the TCO targeted victims by hacking into their computer networks to gain access to their emails. Members of the TCO, who were typically located abroad, watched the victims' email until the victims began to discuss a financial transaction with legitimate

business partners.  Once the legitimate business partners sent wire instructions to finalize the financial transaction, members of the TCO, sent a follow-up email from either the same or substantially similar email address that changed the bank account information in the wire instructions.  As a result, the victims sent money to bank accounts controlled by the TCO.  To facilitate the scheme, the Defendants (and other unindicted co-conspirators) established shell companies in the United States and opened bank accounts in those shell companies' names.  They did this to ensure that they had bank accounts ready and available to receive the illicit wires and to launder the proceeds to hide, among other things, their nature, location, and source.

Kelvin Nkwantabisa ("KO"), who also used the aliases "Kevin Brown" and "KO," was a leader in the U.S.-based operation.  He kept track of any incoming wires, directed other members of the TCO to open bank accounts in various states, and instructed them on when and how to launder the proceeds of the scheme.

Justice Amoh ("Mr. Amoh"), who also used the alias "Samuel Andrews," among others, opened bank accounts using false identities and engaged in financial transactions to launder the proceeds of the fraud.  Mr. Amoh also managed other members of the TCO and instructed them on how to conduct the scheme and hired others to assist in creating false identities and shell companies for the TCO.

Lashea Moore ("Ms. Moore"), who used the alias "Deborah Green," among others, established shell companies, opened bank accounts using false identities, and engaged in financial transactions to launder the proceeds of the fraud.  Like Mr. Amoh, Ms. Moore managed other members of the TCO and hired others to assist in creating false identities for the TCO's use.  She also recruited bank employees to ensure that the illicit wires would not be returned as fraudulent.

2

John Jouissance ("Mr. Jouissance") established shell companies, opened bank accounts, and engaged in financial transactions to launder the proceeds of the fraud.

 2. <u>Examples of the Scheme</u>

The Defendants victimized many individuals and businesses, which resulted in the theft, or attempted theft, of millions of dollars.  To unravel the scheme, law enforcement reviewed, among other evidence, bank records, evidence legally obtained from electronic devices and iCloud accounts,[1] records from electronic communications providers, and public records.  Below are three examples of how the Defendants carried out the scheme:

*Victim 1*

Victim 1 is located in the United Kingdom and produces weigh labelling equipment for a wide range of food processing environments.  On October 28, 2022, Company 1 sent Victim 1 an email that contained wire instructions so that Victim 1 could make a payment of approximately $425,000.  Members of the TCO, however, had compromised Victim 1's email account and the email was routed to a different folder.  Later that day, a member of the TCO sent Victim 1 new wire instructions directing Victim 1 to make the payment to Bank Account 1, which was controlled by the TCO.  Victim 1 sent the payment as instructed.

Unbeknownst to Victim 1, Mr. Jouissance opened Bank Account 1 in the name of FJ Cargo, on October 14, 2022, just 14 days before the TCO sent the fraudulent wire instructions.  Mr. Jouissance first established the shell company FJ Cargo in the State of Ohio on October 5, 2022, claiming that the business purchased cars for export.  The wire sent from Victim 1 posted to Bank Account 1 on November 3, 2022.  On the same day, KO accessed Bank Account 1 online using an

---

[1] Throughout this brief, the Government cites text messages that were exchanged between the Defendants, which contain grammatical errors and misspellings.  The Government has not sought to edit those messages to maintain their integrity.

IP address that was registered to his alias "Kevin Brown." Four bank transfers totaling $377,000 were made to two other banks accounts in FJ Cargo's name. From those two bank accounts, Mr. Jouissance wrote several checks to include the following: (1) $84,679 to Pretty Hair Affair Wig Collection ("Pretty Hair"); (2) $79,027 to DrewSamel Group LLC; and (3) $98,076.00 to Pretty Hair. Once the bank became aware that the wire transfer was fraudulent, it attempted to claw back some of the money before the members of the TCO could deposit the checks. A review of Mr. Jouissance's iCloud account revealed that he knew about the bank's actions because he had a screenshot of a notice from the bank, dated December 13, 2022, which stated that the bank debited Bank Account 1 for $424,982.00 and returned the funds back to Victim 1 due to Fraud.

The TCO controlled the shell companies to whom Mr. Jouissance wrote the four checks. For example, a legal of search of Ms. Moore's electronic devices showed that she controlled the Pretty Hair shell company and its related bank accounts. In her devices, she had screenshots of the business registration documents for Pretty Hair. She also had screen shots of bank account transactions that were associated with the shell company. Likewise, the evidence showed that Mr. Amoh controlled DrewSamel Group. As will be more fully described below, on May 24, 2023, Mr. Amoh was arrested for forgery and possession of a forged instrument. In his possession, law enforcement found a false driver's license in the name "Samuel Andrews," who is the purported "owner" of DrewSamel Group. Law enforcement also found withdrawal slips from a bank account in DrewSamel Group's name and a legal search of Mr. Amoh's devices revealed that it contained pictures of copies of DrewSamel Group's EIN documents.

*Victim 2*

On November 16, 2022, Company 2 sent Victim 2 an email with an invoice attached, seeking payment for services rendered in the amount of $4,925,000. Later that day, a member of

the TCO, pretending to be Company 2, sent an email to Victim 2 asking to amend its banking information. Believing that it was communicating with Company 2, Victim 2 provided the necessary paperwork to update the banking information. On November 21, 2022, a member of the TCO filled out the paperwork and provided, among other things, new bank details that directed Victim 2 to send the almost $5,000,000 payment to Bank Account 2, which was controlled by the TCO. In the paperwork, a member of the TCO included a contact email address that was substantially similar to, but not the same as, Company 2's legitimate email. A few days later, on November 29, 2022, a member of the TCO sent a follow-up email asking if Victim 2 received the amended bank information. On December 12, Victim 2 followed up with Company 2 and added three more invoices, totaling over $4 million, to its past due balance. Between December 5th and 14th, 2022, Victim 2 sent three wire transfers, totaling over $8 million, to Bank Account 2.

An unindicted member of the TCO ("Unindicted Co-conspirator") controlled Bank Account 2. Within a few days of the over $8 million posting to the account, the Unindicted Co-conspirator wrote several checks to shell companies that were controlled by the TCO, including three to DrewSamel Group. One of those checks, Check 1008 in the amount of $558,179, was dated December 13, 2022. The Unindicted Co-conspirator wrote a note on the check, stating that the check's purpose was to pay for electrical materials and engineering fees. A legal review of Mr. Amoh's devices revealed Telegram messages between Mr. Amoh and KO about Check 1008. The Telegram messages specifically referenced Company 2 and the note written on the check.

A review of KO and Ms. Moore's electronic evidence further established the TCO's connection the scheme. For example, KO's iCloud account contained the invoice in the approximate amount of $5,000,000 that Company 2 sent to Victim 2. The iCloud account also contained notes written in the Apple Notepad application that listed the Unindicted Co-

conspirator's name and the name of the shell company that the Unindicted Co-conspirator used to open Bank Account 2.  Additionally, Ms. Moore's device contained a photograph of the driver's license that the Unindicted Co-conspirator used to open Bank Account 2.

*Victim 3*

Victim 3 is an investor who was interested in purchasing shares of stock in Company 3. On December 8, 2022, Company 3 sent Victim 3 an email containing a shareholder's notice, which explained the shares that were available.  Also attached to the email were wire instructions so that Victim 3 could pay for the shares if he decided to purchase them.  On December 12, 2022, a member of the TCO sent new wire instructions directing Victim 3 to send money to Bank Account 3, which was controlled by the TCO.  On December 14, 2022, Victim 3 sent approximately $1,000,000 to Bank Account 3 as instructed.

 To facilitate the scheme, a member of the TCO opened Bank Account 3 in the name SG Lux on November 22, 2022.  On December 15, 2022, the approximately million-dollar payment posted to the account.  On the same day, a member of the TCO transferred $900,000 to Bank Account 4, which was held at the same bank.  The next day, several wire transfers were made to various shell companies controlled by the TCO, including: (1) $194,822 to RDL Transport; (2) $93,031.58 to Tihuma Digital Inc.; and (3) $276,003.67 to DMG Food Co.  Below is a brief discussion of each these wire transfers.

### RDL Transport Wire Transfer

On November 18, 2022, Mr. Jouissance opened Bank Account 5 in the name of RDL Transport.  As part of the account opening documents, Mr. Jouissance submitted a driver's license bearing his name and picture.  On December 16, 2022, the $194,822 wire posted to Bank Account 5.  The next day, Mr. Jouissance ordered three cashier's checks in the name of three members of

the TCO in the amounts of: (1) $47,003.25; (2) $49,679; and (3) $75,972.  A review of Mr. Jouissance's iCloud revealed that he took pictures of all three checks.  Also in his iCloud account, he had, among other items, a picture of the credit union card for Bank Account 5 with his name on it, a picture of the bylaws for RDL Transport, a picture of a debit card for Bank Account 5 in the name of RDL Transport, and the picture of the driver's license with his name and face that was used to open the account.

### *Tihuma Digital Wire Transfer*

Ms. Moore's devices contained evidence showing that she was involved in the Tihuma Digital wire transfer in the amount of $93,031.58.  Specifically, she managed the member of the TCO that opened the bank account that received the money, which was a portion of the proceeds from Victim 3.  For example, on December 16, 2022, Ms. Moore texted KO the details of the bank account that the Tihuma Digital wire was sent to.  In the text, she included the business name "Lewis tihuma digital" and "BOA."  After some back and forth of correcting the information she sent, Ms. Moore finally just sent a screenshot of the bank account information.  About an hour later, KO responded, saying "93,031.58."  Ms. Moore replied, "he is gone send the screenshot please give him some time."  Ms. Moore eventually responded with a screenshot of the wire posting to the bank account.  KO then said, "I need the guy with the BOA to Zelle some bread out to people. So contact him let him know.  It has to be done now."  The next day, Ms. Moore asked KO for additional instructions on what to do with the money.  He told her to have a $47,539.67 check written to a member of the TCO and to bring him $36,350 in cash.  KO reminded Ms. Moore that the wire came from SG Lux, the business to whom Victim 3 unknowingly wired his money.

### *DMG Food Co. Wire*

DMG Food Co. is one of the shell companies that Ms. Moore established using the alias

7

"Deborah Green."  Both KO and Ms. Moore, in an iCloud and iPhone device, respectively, had EIN documents, articles of incorporation and other business organization documents for DMG Food Co.  Ms. Moore's devices also contained a picture that she took of a false driver's license in the name of "Deborah Green" that bore her picture and a document that was purportedly signed by "Deborah Green," stating that "Deborah Green" had the sole authority to conduct transactions on behalf of DMG Food Co.

On December 19, 2022, KO texted Ms. Moore that she received a wire payment from SG Lux in the amount of $276,003.67 on December 16, 2022 (proceeds from the Victim 3 fraud) and advised her of the reason for the payment that was written on the wire's memo line so that she would know what to say if asked.  KO then instructed Ms. Moore to write a $87,844.23 check to a member of the TCO.

For each business or person that the TCO victimized, the TCO virtually followed the same pattern.  Once the hackers intercepted and changed the wire instructions, KO marshalled members of the TCO to provide him with bank accounts to receive the illicit wires, and those members, based on KOs instructions, laundered the money.

**B.  The Charges**

The Indictment charges KO, Ms. Moore, Mr. Amoh, and Mr. Jouissance with conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Count 1).  It also charges KO and Ms. Moore with wire fraud and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1343 and 1956(h) (Counts 2-6).

In the Eleventh Circuit, a defendant can be found guilty of wire fraud only if the Government proves the following elements beyond a reasonable doubt:

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the indictment; and

2. The Defendant knew the unlawful purpose of the plan and willfully joined in it.

*See* Eleventh Circuit Pattern Jury Instructions, Offense Instruction 54 (2024).  The Government "does not have to prove that all of the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement.  The heart of the conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan." *Id.*

A defendant can be found guilty of wire fraud only if the Government proves the following elements beyond a reasonable doubt:

1. The Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

2. The false pretenses, representations, or promises were about a material fact;

3. The Defendant acted with the intent to defraud; and

4. The Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help out or carry out the scheme to defraud.

*See* Eleventh Pattern Jury Instructions, Offense 51 (2024).   The Government does not "have to prove that the material transmitted by the wire was itself false or fraudulent; or that using the wire was intended as the specific or exclusive means of carrying out the alleged fraud; or that the Defendant personally made the transmission over the wire." *Id.*  The Government also "doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone."  *Id.*

Lastly, a defendant can be found guilty of conspiracy to commit money laundering only if

the Government proves the following facts beyond a reasonable doubt:

1. Two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956, which includes the following elements:

   a. The Defendant knowingly conducted or tried to conduct financial transactions;

   b. The Defendant knew that the money or property involved in the transactions were the proceeds of some kind of unlawful activity;

   c. Money or property did come from an unlawful activity, specifically wire fraud;

   d. The Defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds,

2. The Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

*See* Eleventh Pattern Jury Instructions, Offenses 74.2 and 74.5 (2024).

**C. Evidentiary Matters**

At trial, the Government will seek to admit the following categories of evidence in addition to lay testimony: (1) emails between the victims and their legitimate business partners or the TCO; (2) other business records; (3) text messages between the co-conspirators; (4) screen shots or pictures taken by the co-conspirators; (5) certified business organization records; (6) lay opinion testimony; (7) summary exhibits; and (8) if Mr. Jouissance testifies, his convictions for robbery and forgery.  Below is a summary of each category of evidence and an explanation of why the Government believes the evidence is admissible at trial.

1.  <u>Emails Between Victims and Their Legitimate Business Partners or the TCO</u>

As described above in Part I(B), the crux of the wire fraud scheme was that the TCO, with the intent to defraud the victims, used false pretenses by pretending to be a legitimate business partner of the victim to induce the victim to wire large sums of money to a bank account controlled by the TCO.  To prove this, the Government intends to introduce emails exchanged between the victims and their legitimate business partners that discuss the details of the wire and emails the victims unwittingly exchanged with members of the TCO.  The emails are admissible as business records under the Federal Rules of Evidence ("FRE") 803(6).  FRE 803(6) provides that a record of an act or an event is not excluded by the rule against hearsay, if:

> (1) the record was made at or near the time by — or from information transmitted by —someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business; [and] (3) making the record was a regular practice of that activity.

The government intends to satisfy these conditions either by witness testimony or a certification that complies with FRE 902(11).

2.  <u>Other Business Records</u>[2]

Evidence in this case includes business records from various banks, electronic communications providers, and other entities.  These records are relevant to establish: (1) that the wires sent by the victims posted to bank accounts controlled by the Defendants or other members of the TCO; (2) that the Defendants and other members of the TCO laundered the proceeds of the fraud; (3) that the Defendants were in control a particular telephone number, email address, or IP address that was used in furtherance of the scheme; or (4) that the Defendants resided at a specific location while participating in the scheme.  The records are admissible under FRE 803(6), and the

---

[2] The Government has attached the 902(11) business certifications that it has in its possession as Government's Exhibit A.

Government intends to satisfy the conditions outlined above in Part I(C)(1) by a 902(11) certification.

3.   Text Messages between the Defendants or Other Members of the TCO

As described above, the Defendants communicated with one another or other members of the TCO about the scheme.  They used text messages to, among other things, inform one another when a wire was about to be sent or had posted to an account, instruct or receive instructions on what bank accounts to open or how to launder the proceeds of the fraud, purchase false identifications, or order business organization documents.  All these conversations were made in furtherance of the scheme and are either an opposing party's statement under FRE 801(d)(2)(A) or (E).  FRE 801(d)(2)(A) states that "a statement offered against an opposing party and was made by the party in an individual . . . capacity" is not hearsay.  Also, a statement offered against an opposing party is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy."  FRE 801(d)(2)(E).  The Government intends to authenticate these messages by a certification under FRE 902(14), which permits data copied from an electronic device to be self-authenticating, if the data is "authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."

4.   Screenshots, Notes, or Pictures Taken by Members of the TCO

As a means of control, KO often asked members of the TCO to send screenshots or pictures of banking applications, EIN documents, money orders, or checks to prove that they were following his instructions.  Members of the TCO also used screenshots and pictures to share information about the scheme and to facilitate the purchase of false identifications or the establishment of shell companies.  Additionally, the Defendants wrote notes in the Notepad

applications of their devices to keep track of their shell companies, including the false identities associated with the shell company, the bank accounts opened in the name of the shell company, as well as the shell companies' EIN numbers, passwords, and email addresses. These documents were either extracted from the Defendants' devices or contained in their iCloud accounts. The Government intends to authenticate these documents as certified business records or certified data copied from an electronic device, storage medium, or file under FRE 902(11) and (14).

5.   Certified Business Organization Documents

To facilitate the scheme, the Defendants established shell companies for the purpose of hiding their identities and legitimizing the receipt of the illicit wires. They then set up bank accounts in the shell companies' names to receive the illicit wires and launder the proceeds. The Defendants registered, or caused to be registered, the shell companies with the Secretary of State in Georgia, North Carolina, New York, and Ohio. The Government intends to offer official records from the relevant Secretaries of State at trial and will seek to authenticate them pursuant to FRE 902(4). Under this provision, a document is self-authenticating if it is "a copy of an official record — or a copy of a document that was recorded or filed in a public office as authorized by law — if the copy is certified as correct by the custodian or another person authorized to make the certification[.]" FRE 902(4).

Additionally, the Government intends to admit this evidence under FRE 803(8), which states that a record or statement of a public office is excepted from the rules of hearsay if it "sets out the office's activities or a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law enforcement personnel," so long as the source of information does not lack trustworthiness.

6.   <u>Lay Opinion Testimony</u>

The evidence in this case includes thousands of pages of bank records, which show how the Defendants received the illicit wires from victims and laundered the money.  The Government intends to present the testimony of a financial analyst to prove that the Defendants conducted numerous financial transactions using the proceeds of the fraud, including transferring the money between bank accounts, purchasing monetary instruments, and making withdrawals.

This testimony is admissible under FRE 701 as lay opinion testimony because it will be "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge[.]" FRE 701(a) and (c).  The testimony will also be helpful "to determining a fact in issue," mainly that the Defendants designed the financial transactions, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.  *See* FRE 701(b).  The Eleventh Circuit has regularly found that this sort of testimony is admissible. *See United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006) (concluding that "simply add[ing] and subtract[ing] numbers from a long catalog of [business records], and then compar[ing] those numbers in a straightforward fashion" is lay opinion testimony under FRE 701, even if the witness' "expertise and the use of computer software may have made him more efficient at reviewing" the records).

7.   <u>Summary Exhibits</u>

In the same vein, because the evidence contains thousands of pages of bank records, the Government intends to present summary exhibits to summarize the records so that they can be more easily examined by the jury.  Pursuant to FRE 1006, a party "may use a summary, chart or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  *See Hamaker,* 455 F.3d at 1332 n.16 ("The Federal Rules . . .

acknowledge and permit the summary presentation of voluminous documentary evidence.").

       8.  <u>Mr. Jouissance's Felony Convictions</u>

Should Mr. Jouissance testify at trial, the Government intends to introduce evidence of his prior convictions for forgery, in violation of Ohio Rev. Code Ann. § 2931, and robbery, in violation of Ohio Rev. Code Ann. § 2911.  Under FRE 609(a), the Government is permitted to attack a defendant's character for truthfulness by evidence of a criminal conviction if, "in the convicting jurisdiction, [the crime] was punishable by death or imprisonment for more than one year . . ., [and] the probative value of the evidence outweighs its prejudicial effect to that defendant." FRE 609(a)(1)(B).  Mr. Jouissance was convicted of robbery in 2018 and served four years in prison. The probative value of this conviction outweighs any prejudicial effect because Mr. Jouissance's credibility would be a critical issue at trial, particularly if he claims that he thought he had an innocent purpose for receiving the illicit wires or that he was tricked or duped into doing so.  Where "a defendant's credibility is central to the case, this favors admitting evidence of his convictions." *See United States v. Waller*, No. 1:15-cr-83-WSD-JSA, 2016 WL 1746057 at *2 (N.D. Ga. May 2, 2016) (citations omitted).

Similarly, Mr. Jouissance's 2016 forgery conviction is admissible.  Under FRE 609(a)(2), "[r]egardless of the punishment, evidence of any crime "must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement."  FRE 609(a)(2).  Courts have found that forgery convictions fit squarely within the scope of FRE 609(a)(2).  *See United States v. Field*, 625 F.2d 862, 871 (9th Cir. 1980) ("This rule's reference to crimes involving 'dishonesty or false statement' was legislatively intended to be, and judicially has been, limited to crimes involving deceit, untruthfulness or falsification crimes bearing upon a defendant's propensity to testify untruthfully

. . . . Such crimes are always admissible, Rule 609(a)(2) grants no judicial discretion for their exclusion. Therefore, Field's prior conviction for forgery, a crime involving fraudulent falsification, was properly admissible."); *United States v. Govereh*, 2010 WL 28565 at *8 (N.D. Ga. 2010) ("'forgery goes to truthfulness[,]' [t]herefore, these convictions were admissible as a matter of law under Rule 609(a)(2) because all crimes of dishonesty or false statements can be admitted without any balancing tests."); *United States v. Mahone*, 328 F.Supp.2d 77, 82 (D. Me. 2004) (holding that "[f]orgery is plainly within Rule 609(a)(2)'s scope of crimes of dishonesty and false conduct" and "must be admitted[.]").

      9.  <u>Request for a Hearing</u>

With respect to all this evidence, the Government intends to meet and confer with defense counsel prior to the Final Pretrial Conference that is currently set for April 15, 2025, to come to agreement about its admissibility.  If the parties cannot come to an agreement, the Government respectfully asks the Court to hear the parties regarding any such disputes during the Final Pretrial Conference.  Resolving these issues ahead of trial will streamline it, make more efficient use of the jury's time, and avoid briefing and hearings on certain issues during trial.  The Government has also tried to outline all the potential evidentiary matters here, however, if the Government should decide to admit evidence that is not addressed in this Trial Brief, and there is disagreement with counsel, the Government respectfully requests that it be permitted to raise the matter at the Final Pretrial Conference.

Pursuant to Local Rule 88.9, the Government has conferred with defense counsel regarding the requested relief.  Counsel for Mr. Jouissance, Mr. Amoh, and Ms. Moore have no objection to the Government's request for a hearing to resolve any evidentiary disputes at the Final Pretrial Conference.  Counsel for Mr. Nkwantabisa does not object to the request if the government

provides an exhibit list by March 30, 2024.  Otherwise, counsel for Mr. Nkwantabisa objects.

## II.   OMNIBUS MOTION

### A.   Motion to Admit 404(b) Evidence

The Government respectfully moves to admit Ms. Moore's prior conviction for forgery, in violation of Ga. Code Ann. § 16-9-1(c) on January 1, 2017, and her arrest for identity theft, in violation of Ga. Code Ann. § 16-9121(a)(1) on November 10, 2023, pursuant to FRE 404(b).   The Government intends to use this evidence to show that Ms. Moore had the requisite knowledge and intent to commit the charged offense and there was an absence of a mistake.

#### 1.   Legal Standard

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act may not be admitted to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b).  Other-acts evidence, however, is admissible for any other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" with respect to the charged offense.  *Id.*  Rule 404(b) is a rule of "inclusion which allows [extrinsic] evidence unless it tends to prove only criminal propensity." *See United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004) (emphasis added) (quoting *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989)).

To be admissible, evidence offered pursuant to Rule 404(b) must satisfy a three-part test: (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act; and (3) the evidence must pass the Rule 403 balancing test.  *See United States v. Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004); *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir.1992) (en banc).  Rule 404(b) evidence is not limited to criminal convictions, but can consist of uncharged

crimes, wrongs, or other acts. Indeed, even evidence of an act for which a defendant was previously acquitted can be admitted under Rule 404(b). *United States v. Ozuna*, 129 F.Supp.2d 1345, 1350 (S.D. Fla. 2001).

> 2.  Ms. Moore's Forgery Conviction and Identity Theft Arrest are Admissible to Prove Intent, Knowledge, and an Absence of Mistake

By pleading not guilty to the charges, Ms. Moore has put the elements of the charges squarely at issue. *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998) ("A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue."). Therefore, at trial, the Government must prove that Ms. Moore acted with the intent to defraud when she participated in the scheme to induce the victims to wire money to the Defendants and other members of the TCO by means of false or fraudulent pretenses, representations, or promises.

The Government expects that one of Ms. Moore's defenses will be that she either believed that the wires were transferred to her bank accounts for some innocent purpose or that KO tricked her into participating in the scheme. Consequently, evidence of Ms. Moore's prior forgery conviction and identity theft arrest are highly probative of her criminal intent, knowledge, and absence of mistake. *See United States v. Landry*, 631 F.3d 597, 603 (1st Cir. 2011) (affirming the admission of a prior bad act where the defendant provided a false name and social security number during a traffic stop to show intent, knowledge and absence of mistake in a wire fraud case involving the defendant's use of a false identity to apply for credit cards).

As described above, to facilitate the BEC scheme, Ms. Moore opened bank accounts using the false identity "Deborah Green," who she purported was the president of DMG Food Co. (a shell company). As part of the account opening process, she submitted a fake driver's license and

created a forged document signed on behalf of "Deborah Green," stating that "Deborah Green" had the authority to conduct financial transactions on behalf of DMG Food Co. Both the forgery conviction and the identity theft arrest "are suggestive of her intent to provide another's identity as her own" and to create a false document in a fictitious name. *Landry*, 631 F.3d at 603. Because "[t]he challenged act involved the same mental state as the charged crime . . ., it satisfies the requisite intent component" required to admit 404(b) evidence. *United States v. Green*, 40 F.3d 1167, 1174 (11th Cir. 1994). Similarly, the conviction and arrest are probative of Ms. Moore's knowledge that her possession and use of the false driver's license and forged document were criminal in nature and not a mistake.

### 3. A Certified Conviction and Witness Testimony is Sufficient to Prove that Ms. Moore Committed the Extrinsic Act

As proof of Ms. Moore's prior bad acts, the Government intends to introduce a copy of her certified conviction for forgery and witness testimony for the identity theft arrest. A certified conviction is more than enough to satisfy this prong of the test; thus Ms. Moore's prior forgery conviction is admissible. *See United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) ("It is elementary that a conviction is sufficient proof that [the defendant] committed the prior act."). Likewise, witness testimony regarding Ms. Moore's identity theft arrest is sufficient to prove by the preponderance of the evidence that she committed the prior bad act. *See United States v. Edouard*, 485 F.3d 1324, 1345 (11th Cir. 2007) (concluding that witness testimony of co-conspirators who were expecting a reduction in sentence was sufficient to satisfy the second 404(b) prong because a "jury could have found by a preponderance of the evidence that [the defendant] committed th[e] extrinsic conduct.").

4.  <u>The Admission of Ms. Moore's Prior Bad Acts Would Not Be Overly Prejudicial</u>

Lastly, the probative value of Ms. Moore's prior bad acts greatly outweighs any prejudicial affect that may arise from their admission.   In determining whether this prong of the 404(b) test is met, courts must conduct "'a common sense assessment of all the circumstances surrounding the extrinsic offense,' including prosecutorial need." *Calderon*, 127 F.3d at 1332 (internal quotation omitted).  As mentioned above, the Government expects Ms. Moore will argue that she believed there was some innocent purpose for receiving the illicit wires or that KO tricked her. Evidence of Ms. Moore's intent, knowledge, and absence of mistake is critical to rebutting such claims.  The admission of the forgery conviction and identity theft arrest will help to prove that Ms. Moore understood the criminal nature of her conduct and that she acted with criminal intent.

In addition to the United States's need for the evidence, courts also consider whether the "time span between [the defendant's] prior convictions and the present offense [is] 'too remote for proper consideration.'"  *United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003) (*abrogated in part on other grounds by Rehaif v. United States,* 588 U.S. 224 (2019) (quoting *United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997)).  Here, the Defendant's prior bad acts are well within the range of admissible prior convictions under Eleventh Circuit precedent because they both occurred less than six years ago.  *See, e.g., United States v. Patrick*, 536 F. App'x 840, 842-43 (11th Cir. 2013) (affirming admission of 18-year-old armed robbery conviction in a felon-in-possession trial); *United States v. Gil*, 581 F. App'x 766, 772 (11th Cir. 2014) (finding seventeen-year old conviction, when offered to prove defendant's participation in a drug conspiracy, not too remote to prove intent); *United States v. Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995) (finding fifteen-year span did not render the extrinsic acts too remote for proper consideration).

Moreover, a limiting instruction regarding the prior conviction and identity theft arrest would mitigate any potential prejudicial effect from the evidence of Ms. Moore's prior bad acts. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993). As such, the third prong of the 404(b) test is met, and Ms. Moore's prior bad acts are admissible.

Pursuant to Local Rule 88.9, the Government has conferred with counsel for Ms. Moore who opposes this requested relief.

## B. **Motion to Admit Inextricably Intertwined Evidence**[3]

As mentioned above in Part I(A)(2), Mr. Amoh was arrested by New York state authorities in connection with this case. The Government believes the arrest is direct evidence of the conduct charged in the Indictment. If the Court, however, disagrees, the Government respectfully seeks to introduce Mr. Amoh's prior arrest for forgery and criminal impersonation as inextricably intertwined evidence because the arrest (and the evidence recovered as a result of the arrest) proves that Mr. Amoh used the alias "Samuel Andrews" to facilitate the BEC scheme.

### 1. Facts of the Arrest

Prior to definitively identifying Mr. Amoh as a member of the scheme and during the conspiracy's timeframe, law enforcement became aware that a person using the alias "Samuel Andrews" had opened several bank accounts at Financial Institution 1 and engaged in suspicious

---

[3] The Government also intends to introduce evidence regarding uncharged illicit wires that are a part of the scheme to defraud. The Eleventh Circuit has routinely held that uncharged conduct within the timeframe of the conspiracy is admissible as inextricably intertwined conduct. *See United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015) ("Our Circuit repeatedly has held that evidence of uncharged conduct that is part of the same scheme or series of transactions and uses the same modus operandi as the charged offenses is admissible as intrinsic evidence outside the scope of Rule 404(b)."); *see also United States v. Holland*, 722 Fed. App'x 919, 926 (11th Cir. 2018) (same); *United States v. Shabazz*, 887 F.3d 1204, 1217 (11th Cir. 2018) (for uncharged conduct to be admissible "it is enough that the uncharged evidence was an 'integral and nature part of the account' of the . . . conspiracy . . . . The evidence of uncharged conduct [is] highly probative of the existence of a conspiracy[.]").

activity.  On May 23, 2023, law enforcement asked Financial Institution 1 to contact "Samuel Andrews" and advise him that he needed to withdraw the remaining balance in his account because the bank was going to close his account due to suspicious activity.  The next day, Mr. Amoh arrived at Financial Institution 1 and presented a false Arizona driver's license in the name of "Samuel Andrews."

Subsequently, law enforcement learned that the driver's license number listed on the driver's license belonged to another person.  They arrested Mr. Amoh for: (1) possession of a forged instrument, in violation of N.Y. Penal Law § 170.25; (2) forgery of tokens or a monetary instrument and an official document, in violation of N.Y. Penal Law 170.10; and (3) criminal impersonation of another, in violation of N.Y. Penal Law 190.25.

Law enforcement conducted a lawful search of Mr. Amoh and found, among other things, credit cards in the name of "Samuel Andrews" and DrewSamel Group (one of the shell companies used to facilitate the scheme), withdrawal slips from a bank account in the name DrewSamel Group that were signed by "Samuel Andrews," and a bank check made out to "Samuel Andrews."  After Mr. Amoh was taken into custody, he agreed to speak with law enforcement, provided a false exculpatory statement, and signed a consent form to search his cell phones.

2.   Legal Standard

Evidence of prior bad acts is not extrinsic under Rule 404(b) if it: (1) arose out of the same transaction as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably linked with the charged offense. *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008).  It is axiomatic that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime or forms an integral and natural part of

an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. McClean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)); *see also Edouard*, 485 F.3d at 1344 (11th Cir. 2007) (holding that "evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses to which the defendant was indicted.'" (quoting *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989)).

3. <u>Legal Analysis</u>

Evidence (including law enforcement testimony) of Mr. Amoh's arrest for forgery and criminal impersonation is necessary to complete the story of the crime and is inextricably linked to the offense. As explained above, in part to hide his identity, Mr. Amoh used aliases to open bank accounts in the name of shell companies so that he could receive illicit wires from victims and launder the proceeds. Without introducing evidence of Mr. Amoh's arrest, the Government would be unable to adequately explain how it: (1) determined that Mr. Amoh used the "Samuel Andrews" alias; (2) recovered the false driver's license in "Samuel Andrews" name from Mr. Amoh; or (3) obtained Mr. Amoh's consent to search his phones. Such an explanation is critical to proving that Mr. Amoh impersonated "Samuel Andrews," as is described above and in the Indictment (DE 3).

Pursuant to Local Rule 88.9, the Government has conferred with counsel for Mr. Amoh who opposes this requested relief.

**C.  <u>Motion to Exclude Evidence</u>**

In advance of trial, the Government seeks an *in limine* ruling to exclude all improper comments, commentary, and arguments as irrelevant that: (1) invoke a duress defense; (2) blame

the victims or financial institutions for the Defendants' criminal conduct; and (3) are pure nullification.

> 1. <u>The Court Should Exclude All Arguments or Commentary Invoking a Duress Defense</u>

Throughout the timeframe of the conspiracy, KO and Ms. Moore were involved in a relationship that, at points, was volatile. Strewn throughout their conversations discussing the fraud scheme, the two engaged in heated arguments, which included claims of physical altercations. Due to this, the Government expects that Ms. Moore may claim that she felt coerced or participated in the scheme while under duress. But it's the government's position that Ms. Moore cannot satisfy the elements of this defense, particularly the rigorous prong of imminency.

To successfully establish a duress defense, a defendant must show that he or she: (1) was faced with an unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) had no reasonable legal alternative to violating the law; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *United States v. Deleveaux*, 205 F.3d 1292, 1297 (11th Cir. 2000).

Before this defense can be presented to a jury, a defendant must make "a prima facie showing as to each of the [duress defense's] elements." *United States v. Pestana*, 865 F. Supp. 2d 357, 361 (S.D.N.Y. 2011) (citing *United States v. Villegas*, 899 F.2d 1324, 1343 (2nd Cir. 1990) (internal quotations omitted)); *see also United States v. Montgomery*, 772 F.2d 733, 736 (11th Cir. 1985) ("In order to have the defense submitted to a jury, a defendant must first produce or proffer evidence sufficient to prove the essential elements of the defense."); *United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008) ("a defendant is not entitled to present a duress defense to the jury unless the defendant has made a prima facie showing of duress in a pre-trial

offer of proof") (citing *United States v. Moreno*, 102 F.3d 994, 998-99 (9th Cir. 1996)).  This is because if "the evidence to be presented [is] insufficient as a matter of law, no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter." *Pestana*, 865 F. Supp. 2d at 361-62 (internal quotations omitted).

In other words, "evidence of duress is not relevant if the defendant fails to present evidence of a prima facie case of the affirmative defense." *Vasquez-Landaver*, 527 F.3d at 804. "While the constitutional right to testify permits a defendant to choose whether or not to take the witness stand, it does not authorize a defendant to present irrelevant testimony." *Id.* at 802.  Thus, if the defendant is unable to make a prima facie showing as to each element of the duress defense, the Court may lawfully preclude him from testifying on that matter because such testimony is irrelevant.  *See United States v. Bailey*, 444 U.S. 394, 415 (1980); *Montgomery*, 772 F.2d at 736.

It is the Government's position that should Ms. Moore attempt to raise a duress defense, she would be unable to satisfy the elements to support it.  Concerning the first element alone, which is a "rigorous one," a fear of future bodily harm to one's self or to others will not suffice." *United States v. Wattleton,* 296 F.3d 1184, 1196 n. 20 (11th Cir. 2002).  A "generalized danger" to the defendant or others does not constitute the type of "extraordinary circumstance" contemplated by this affirmative defense. *United States v. Bell*, 214 F.3d 1299, 1302 (11th Cir. 2000).  In short, "nothing less than an immediate emergency" is required to satisfy this element, and the Government is unaware of any evidence supporting an immediate emergency in this case.  *Id*. at 1300.  Indeed, the evidence in this case supports just the opposite.  Throughout the course of the conspiracy, Ms. Moore exercised free agency, including ignoring KO's requests to speak and failing to meet with KO to turnover his (and the hackers') share of the proceeds of the crime.  If

Ms. Moore was faced with an unlawful and present, imminent, and impending threat of death or serious bodily injury, she was would have been too afraid to disobey KO's demands.

As to the third element, even if Ms. Moore was under some type of duress, she would fail to satisfy the third element of the defense.  To avail herself of the duress defense Ms. Moore "must have taken any reasonable opportunity that she had during the commission of the crime to inform police or other authorities." *United States v. Alvear*, 181 F. App'x 778, 781 (11th Cir. 2006) (citing *United States v. Lee*, 694 F.2d 649, 654 (11th Cir. 1983)).  Given that during the timeframe of the conspiracy, which was almost two years, Ms. Moore traveled to other states to open bank accounts and even traveled to the Dominican Republic without KO, she had ample opportunity to escape and inform the authorities.  Any duress defense raised by Ms. Moore would be legally insufficient, thus any commentary or argument regarding such defense should be excluded.  *See Bailey,* 444 U.S. at 416 (holding that testimony, evidence, and argument of irrelevant, legally insufficient defenses should be excluded); *United States v. Anderson*, 872 F.2d 1508, 1516 n. 12 (11th Cir. 1989) ("the details of alleged activities based upon an invalid defense should be excluded because they are irrelevant as a matter of law to the charges in the indictment").

Pursuant to Local Rule 88.9, the Government has conferred with counsel for Mr. Moore who opposes this requested relief.

### 2.   Blaming the Victims or Financial Institutions for the Defendant's Conduct

The Government also anticipates that the Defendants may try to blame the victims or financial institutions for their conduct, claiming that if the victims or financial institutions had engaged in more due diligence, the Defendants would not have been able to carry out the scheme. Not only is such an argument untrue and irrelevant, it also risks confusing and misleading the jury.

The crime of wire fraud focuses on a defendant's conduct; it does not hinge, nor is it

negated, by the actions of another party.  As the Eleventh Circuit's Pattern Jury Instructions highlights, although one of the elements of the crime is that the Defendants or their co-conspirators made a misstatement about a material fact, a "fact is 'material' if it has the *capacity or natural tendency* to influence a person's decision. It doesn't matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false."  Eleventh Circuit Pattern Jury Instructions, Offense Instruction O51 (2024) (emphasis added); *see also Neder v. United States,* 527 U.S. 1, 24-25 (1999) ("[t]he common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes.").

Accordingly, the Eleventh Circuit has made clear that "[t]he victim's negligence is not a defense to criminal conduct" and that "[t]he laws protecting against fraud are most needed to protect the careless and the naive from lupine predators, and they are designed for that purpose." *United States v. Svete*, 556 F.3d 1157, 1167 (11th Cir. 2009) (quoting *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980)) (internal quotation marks and alterations omitted).  As the Court of Appeals reasoned in *Svete* (an en banc decision overruling a line of cases requiring that fraud schemes be capable of tricking a "reasonably prudent person"):

> [b]ecause the focus of the mail fraud statute, like any criminal statute, is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud. Proof that a defendant created a scheme to deceive reasonable people is sufficient evidence that the defendant intended to deceive, but a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. Either way, the defendant has criminal intent.
> . . . .
>
> A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence.

556 F.3d at 1165; *see also United States v. Kelly et al*, Case No. 24-cr-20079-FAM, DE:258 (Hon. Federico Moreno, S.D. Fla., February 14, 2025) (advising the jury "[b]ut, if you find that the

27

Government has proven all the elements of wire fraud beyond a reasonable doubt, it is not a defense that such fraud would not have occurred if the victims had acted with greater care. A perpetrator of fraud is no less guilty of fraud because her victim is also guilty of negligence."). Thus, any mention of the victims' or financial institutions' supposed negligence or lack of due diligence would be irrelevant and must be excluded.

Pursuant to Local Rule 88.9, the Government has conferred with counsel for Mr. Amoh, Mr. Jouissance, and Mr. Nkwantabisa who oppose this requested relief. Counsel for Ms. Moore does not object.

### 3. Improper Statements, Commentary and Argument Related to Jury Nullification

Finally, the Government also seeks an *in limine* ruling to exclude all arguments designed to nullify the jury. "Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court – in the words of the standard oath administered to jurors in the federal courts, to 'render a true verdict according to the law and the evidence.'" *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (citation omitted). The Eleventh Circuit has unequivocally disapproved of this practice and has issued clear instructions that "defense counsel may not argue jury nullification during closing argument." *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983); *see United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) (collecting cases in support of proposition that a defendant has no right to present evidence or make arguments geared towards nullification).

Because "trial courts have the duty to forestall or prevent such conduct," *Thomas*, 116 F.3d at 616, the Government moves to exclude evidence and to preclude argument designed to convince the jury to acquit not because the government failed to prove the charged crimes, but rather because a guilty verdict would be contrary to one's sense of justice, morality, or fairness. *Washington v.*

28

*Watkins*, 655 F.2d 1346, 1374 n.54 (5th Cir. 1981) (noting that with respect to jury nullification, courts "have almost uniformly held that a criminal defendant is not entitled to an instruction that points up the existence of that practical power to his jury"); *United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming trial court's refusal to admit evidence bearing no legal relation to the charges but which might encourage a "conscience verdict" of acquittal); *United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) ("[D]efendants are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.").

Improper arguments would include, for example, suggestions that the prosecution is unfair because the Government has prosecuted some individuals, but not others.  Moreover, the identity and quantity of individuals charged in connection with the fraud, the reasons behind the Government's charging decisions, and the culpability of the Defendant as compared to other individuals are all examples of irrelevant and unfairly prejudicial evidence aimed at jury nullification.  *See, e.g.*, *United States v. Thompson*, No. No. 99-41007, 2001 WL 498430 at *16 (5th Cir. Apr. 9, 2001) (unpublished) (upholding grant of government's motion *in limine* to prevent counsel from comparing defendant's conduct to that of other uncharged or immunized witnesses); *see also, e.g.*, *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005) (government's exercise of prosecutorial discretion is not proper subject for cross-examination).  Finally, the prohibition of jury nullification arguments also includes those calculated to invoke sympathy, such as referring to the Defendant's health, age, potential punishment, and potential effect on his family.  Thus, the Defendants should be precluded from making arguments or comments to the jury—and from eliciting statements on cross-examination—which are irrelevant to the charges and, instead, are designed to encourage a verdict without regard to the law.

**CONCLUSION**

For the foregoing reasons, the Court should grant the relief requested herein.

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:     *//s Quinshawna S. Landon*
Quinshawna S. Landon
Assistant United States Attorney
Florida Bar No. 99835
99 Northeast 4th Street
Miami, Florida 33132-2111
Miami, Florida
Tel: (305) 961-9362
Email: Quinshawna.Landon@usdoj.gov

*/s/ Alexandra Comolli*
ALEXANDRA COMOLLI
Assistant United States Attorney
Court ID No. A5502803
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9040
Email: Alexandra.Comolli@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the

Court and delivered to counsel of record using CM/ECF this 17th day of February 2025.

*/s/ Quinshawna S. Landon*
QUINSHAWNA S. LANDON
Assistant United States Attorney

30